**Saverio NASTA et al., Libelants,**

v.

**UNITED STATES of America,
Respondent.**

United States District Court
S. D. New York.

July 23, 1959.

Jacob Rassner, New York City, for libelant.

Arthur H. Christy, U. S. Atty., New York City, Benjamin H. Berman, New York City, Admiralty and Shipping Section, Department of Justice, William A. Wilson, New York City, and Robert D. Klages, New York City, of counsel, for respondent.

KNOX, District Judge.

In this suit, ten persons, former employees of Constable Hook Shipyard, Inc., of Bayonne, New Jersey, seek to recover damages from the United States for injuries (contact dermatitis) allegedly sustained in June and July, 1955, while doing work in the holds of a deactivated vessel, the John Marshall, owned by the United States, and undergoing repairs and alterations, at the aforesaid shipyard.

As originally begun, the action was founded on the provisions of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. In the course of the trial, proctor for libelants stated, "I don't think [the admiralty] issue is in the case anymore. I do not intend to burden the Court with that problem. * * * We are going to rest on New Jersey State law. * * * *"

In libelant's brief, after trial, it is said:

"* * * Libelants predicate liability on the charge that the vessel was not reasonably safe in that the holds of the vessel where they were required to work were covered with a substance which would scale, or flake off and dissolve, as it came in contact with the wet or perspired skin of each libelant. * * * (W)ithin a day or two of such contact, various parts of the person of each libelant, including the eyelids, became itchy and inflamed."

The John Marshall, a Liberty type vessel, was operated by an agent of the United States from 1942 to 1946. In the latter year, the ship was deactivated, and placed in the James River Reserve

(Mothball) Fleet. In April, 1952, the ship was transferred to the Hudson River Reserve (Mothball) Fleet. During her deactivation, the vessel's standing rigging and booms were lowered into cradles; the cargo blocks were removed, and stowed in the 'tween decks; the boilers were drained, the main engine was inoperative, and the electrical equipment was covered with a preservative. The John Marshall, in fact, was a "dead ship", and incapable of navigation. This fact is conceded by libelants.

After the ship became a unit of the Hudson River Reserve Fleet, 819 man hours of labor were expended upon her. This work consisted of rust removal, the storage of tank tops, sweeping, etc. None of the workers, so far as appears, suffered ill effects as a result of his presence aboard the ship.

According to the Superintendent of the Hudson River Reserve Fleet, no metal preservative of any kind was applied to the cargo holds of the dismantled vessel.

On May 22, 1955, the ship was towed to Brewer's Dry Dock on Staten Island, New York, where she was drydocked, and surveyed. This work was under the direction and supervision of John B. Carlson, a marine engineer, licensed for steam and motor vessels of any tonnage. For upwards of ten years, he has been employed by the United States Department of Commerce as a marine surveyor.

Upon completion of Carlson's survey, he specified certain work items that were to be performed aboard the vessel. Constable Hook Shipyard, Inc., was the successful bidder on the work to be done, at a cost of $280,186.

Carlson testified that when he inspected the ship at Brewer's dry dock, the holds were exceptionally clean, and were painted white. The paint was "in fair condition, except for minor peeling."

While the ship was in dry dock, a pitometer log was installed in her No. 2 hold. This is a speed measuring device that extends through the vessel's hull. In order to effect this installation, it was necessary to burn and weld certain metal portions of the ship. During this operation, from the 9th to the 24th of June, 1955, twenty, or more, men were employed upon the vessel. None of them complained that his physical condition had been adversely affected by reason of his work upon the ship. Nor did Carlson himself suffer any discomfort.

The witness further said that he noticed no accumulation of dust on the floors, ceilings, or beams of the holds. In fact, he stated, "* * * I would say she (the vessel) was exceedingly clean, exceptionally clean, from my experience with ships in lay-up." He also testified that, from his examination of the vessel's holds, none of them had been treated with a metal preservative.

Nevertheless, he did say that in No. 3 hold, a shield, composed of wooden boards, or planks, had been built over the after bulkhead. The spaces between the boards were sealed with tar or pitch. This structure, Carlson assumed, had been erected to keep heat from the ship's boilers away from grain which, he thought, might have been stowed in that hold.

In the early hours of June 27, 1955, the John Marshall was towed from Brewer's dry dock to the plant of the Constable Hook Shipyard. She was tied up, and placed in the exclusive possession of that company. At about 7:30 A. M., a gang of men went aboard the Marshall, and opened her hatches.

One of them, Alfred Necklen, then 59 years of age, was employed as a laborer. He seems to have been an "off and on" worker. According to him, there was a custom that, before work began, they (apparently the shipyard) were "to steam out the ship, before you go down there (in the holds)." This was not done.

But, be this as it may, when Necklen, and his fellow workers, opened the hatch in the "first" hold, he saw something like "a grayish powdered smoke all over the boat. When we breathed it, we must have got [it] in our system too, but it affected my eyes, and made me blind for two days * * *. We would itch all

over our bodies. The breathing was kind of stuffy \* \* \* When we were doing that work we had to work a little harder, puff a little more. \* \* \* It was all up my nose, dried it all up, and made it all itching. The mouth was the same. We all ran for water, drank an awful lot of water. There were no blowers whatsoever," and none were installed. "The next morning my \* \* \* eyes were very sore. I washed them with boric acid. \* \* \* "

"I went aboard the ship the (second day) and it was worser, \* \* \* my eyes got tears, and worse and worse."

Upon being asked if the smoke was present on his second day of work, the witness replied, "I wouldn't say it was the smoke, but I think it was accumulated \* \* \* in there. It seemed like a smoke. It would go and travel \* \* \* We were down in the bilges (taking) off the timbers and ballast." At the end of the day, the witness "felt pretty bad" and going home, he kept wiping his eyes, and "couldn't see whatever."

Two or three days thereafter, Necklen, along with three or four other employees, who were working on board the John Marshall, were directed by someone connected with the shipyard, to report to the company's doctor for treatment. This, they did. After the doctor examined Necklen, the latter was given a prescription for a tube of ointment, which was to be applied to his eyes. He was given nothing to relieve the itching of his skin.

Approximately two weeks after Necklen went to work, he was discharged. Since that time, he has been employed in various types of work, and claims that, from time to time, his eyes give him trouble, and his skin itches.

Philip Romano, aged about 44 years when he worked on the John Marshall, is a burner and welder of metal, and uses an acetylene torch. At about 8:15 A. M., on June 27, 1955, he entered the vessel's No. 2 hold, accompanied by his "snapper", and a shipyard foreman. The latter told Romano what he wanted "burned and flushed out with the torch." The fore-

man left the hold, and Romano went to work on a hatch coaming in the shelter deck. The coaming was welded on to a plate and about an inch thick. In burning it "there (was) a lot of smoke." Romano testified that as he entered the hold, it looked smoky from some kind of powder, having a black or grayish color. It was lying all over the hold, and had to be swept away in order to burn the steel on which Romano was to work.

The rungs of the ladder, leading into the hold, were covered with the powder, and transmitted to Romano's gloves. The powder had a rancid odor, especially during the burning operation. The powder then turned white, and had the consistency of flour. This substance got on Romano's face, neck and arms. He experienced no reaction from this contact for a couple of days. His skin then felt as though it were sunburned, and became red and raw, and when water was put on his face, it felt like fire. A few days later, a rash broke out on his legs and arms. He had itching all over his body, and a burning sensation in his eyes.

The witness, along with other employees, went to see the shipyard's physician, who prescribed a salve for Romano's body, and some drops for his eyes. These were ineffective. Romano lost about three days' time. On another occasion, he worked for half a day, and then went home. The witness, after going to the company's doctor three or four times, and, getting no relief, went to see his own physician, Doctor Higgins. The latter thought the trouble was due to the presence on the ship of something with which it had been painted. The treatment furnished by Doctor Higgins was not immediately effective, and one of Romano's feet became so inflamed that it had to be bandaged.

Nevertheless, Romano continued to work aboard the ship for two and a half months, when he was laid off. He continued to receive treatment from Doctor Higgins, and after about a year, and with the use of cortizone salve, he got relief from the itching of his skin. However, he has some scars on portions of his body, and, now and then, his eyes burn

and run. For this affliction, Romano treats himself at home. His eyesight has not been impaired, and he can read newspapers without difficulty. Nevertheless, occasionally, especially in hot weather, he is troubled by the itching of his body, and for five or six days a year, he is unable to work. In 1953, Romano worked aboard a ship that had carried sulphur, and had an infection of his eyelids.

Romano's doctor bills amount to something over $200, and he has expended about $53 for medicines. He ordinarily earns $31.20 a day.

Another employee of the shipyard was William J. Scheurer. He worked as a "chipper". That is, after a piece of steel had been "burned", he evened up its edges. He testified that the deck of the John Marshall was covered with a splinter protective, composed of an asphalt compound. This was designed to absorb the shock of an explosive shell which might strike the deck, and thus save the ship from "being torn up." This material was in the form of slabs 3 by 6 feet in size, which were bolted to the deck. The slabs had to be removed by jack hammers. After working on this job for three days, Scheurer went into one of the ship's holds to do chipping on apron plates in the 'tween deck.

While so engaged, Scheurer experienced a "burning" of his face, neck and eyes. It was so severe that he requested leave to see a physician. His request was granted, and he returned to work the following morning. But, about 11 o'clock A. M., when the sun was strong, Scheurer was again so bothered that he couldn't work, except in the shade. He paid another visit to his physician, and was given a prescription.

On being asked if he saw anything in the hold that could be an irritant, Scheurer replied, "Yes, I did. They had a preservative sprayed there, the interior of the hull was sprayed, and after laying up so long, it was flaky, and when you are chipping, you cause a great amount of vibration that will shake anything there is loose." In doing his work, Scheurer used a chisel, chipping hammer, and a "gun" operated by compressed air. He attributed his discomfort to the fact that whatever was laying above was drifting down. "The * * * warm weather, and * * * sweating excessively, helped." His irritation, principally, was on his face, eyelids, neck and hands. He wore a handkerchief, tied around his neck, and whatever was falling down piled up along the handkerchief, settled in that area, and dissolved, forming a welt. The temperature, at certain times of the day, was well up in the 90's. Aside from the open hatches, there was no ventilation within the hold.

Later on, the 'tween decks were opened, by the removal of pontoon hatches. When, at that time, one went below, three or four burners were working around the square of the hatch, and there was "a great amount of smoke and heat."

From time to time, over the years since Scheurer worked on the John Marshall, he has had recurrences of the itch and annoyance that developed while he was aboard the ship. These attacks, seemingly, are not acute. They are, nevertheless, vexatious, and unpleasant. The attacks occur in winter, as well as in summer. On the whole, they do not interfere with Scheurer's ability to work. It is possible, according to the medical testimony, that the annoyance of his ailment, and that of the other libelants, may continue indefinitely.

Another libelant is Saverio Nasta. He worked aboard the John Marshall as an acetylene torch burner. He, too, in the performance of his duties, acquired the "itch". His experience with the affliction, more or less, was similar to that of the persons previously mentioned.

Sometime, shortly after the workers on the John Marshall developed rashes, someone, described as a "government" inspector, visited the shipyard, and talked to some of the men who had developed skin disorders. The name of this "inspector" was not revealed, and he was not called as a witness. Consequently, I know nothing of what he saw, did, or learned.

Each libelant, to a greater or lesser degree, was affected by the irritant that is said to have been within the holds of the vessel. The discomfort suffered by some of them was of a minimum character, and that of others, was substantial. It seems unnecessary to describe in detail the extent of skin irritations of each of the libelants. What has already been said is representative of the ailments suffered by all of them.

The differences between the severity of libelants' skin irritations were due, I suppose, to the fact that the sensitivity of the skin of one person differs from that of another. As a matter of fact, some 25 or 30 persons worked aboard the John Marshall. Only ten workers have sued.

So far as the underlying cause of libelants' skin irritations is concerned, there is no definite proof. The powdery substance, said to have been found within the holds of the vessel, was never analyzed, nor was it seen by any of the physicians who treated the libelants. As a result, the actual cause of the skin irritations is a matter of circumstantial evidence.

The officials of the shipyard, although fully aware of the physical distress of its employees, did nothing to ascertain the chemistry of the "powder", "flakes", paint or preservatives, heretofore mentioned; or make an investigation in connection therewith. At the trial, no person connected with the shipyard testified as to the condition of the vessel's holds while she lay at her berth at Constable Hook.

Upon the record before me, I see no reason to impose liability upon the United States. The testimony of the Government clearly shows that the John Marshall was completely deactivated, and, at the time in question, was beyond the possibility of going to sea. She had no crew or officers aboard, and it seems not to have been contemplated that she could, or would, in the foreseeable future, go to sea. Upon leaving the Constable Hook Shipyard, the vessel was towed to the "mothball" fleet in the Hudson River; and, so far as the proof shows, she is still there.

At the time libelants suffered their injuries, the vessel was in the sole custody and control of the shipyard. Supposedly, the shipyard, before making its bid upon the work to be done, examined the ship, and knew of her then condition. The Government, of course, if aware of any hidden danger, or latent defect, in the vessel, was under an obligation to call the same to the attention of the shipyard. So far as is shown, no such hazards existed. Therefore, it became the duty of the shipyard to furnish its employees with a reasonably safe place in which to work. It knew and controlled the conditions of the work to be done, and the equipment which should be used. See Union Carbide Corporation v. Goett, 4 Cir., 256 F.2d 449; and Lyon v. United States, 2 Cir., 265 F.2d 219.

In this respect, the shipyard, in my opinion, was woefully negligent. Within the holds of the ship, in late June of 1955, when the weather was extremely hot, there was no ventilation, except from open hatchways, and three or more men were "burning" steel. At least one man was "chipping" with a pneumatic air hose. The burning of steel with acetylene torches would, I believe, be productive of an abrasive residue, or ash, which, with the dust created by the use of a pneumatic hose, would sear the skin of most anyone. This might, I think, have been avoided by the use of "blowers", which would have generated currents of air within the holds, and carried away the irritants that have tormented libelants. The holds of the ship, under conditions that existed, must have been little short of an inferno. For this, the shipyard, and not the United States, was responsible. The libel herein will be dismissed.

The foregoing opinion shall constitute the court's findings of fact and conclusions of law. The parties will settle an appropriate decree and submit such proposed additional findings of fact and conclusions of law as are deemed by them to be necessary.